STATE of South Dakota, Plaintiff
and Respondent,

v.

Dayo D. NAGEL, Defendant
and Appellant.

No. 12525.

Supreme Court of South Dakota.

Argued April 18, 1979.

Decided June 14, 1979.

James E. McMahon, Asst. Atty. Gen., Pierre, Thomas J. Welk, Asst. Atty. Gen., Pierre, for plaintiff and respondent; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

John J. Burnett, Rapid City, for defendant and appellant.

HERTZ, Circuit Judge.

Appellant appeals from his conviction of the following crimes:

I. Conspiracy with Donald Samuelson to willfully and unlawfully engage in a practice and course of business in the sale and purchase of securities which worked and tended to work a fraud upon the stockholders of Dakota National Life Insurance Company and others during the months of September and October, 1977 (violation of SDCL 47–31–128);

II. Selling an unregistered security allegedly committed on October 18, 1977 (violation of SDCL 47–31–9);

III. Acting as a securities agent without registration allegedly committed on October 18, 1977 (violation of SDCL 47–31–124).

The facts are long and detailed, but of necessity by reason of the nature of the charges, must here be set out in full.

Prior to any activity in the State of South Dakota, Rainbow Sales International, Inc. (Rainbow Sales), had been incorporated in the State of North Dakota. The corporate headquarters for Rainbow Sales was stated to be Horace, North Dakota (advertised as Fargo's fastest growing suburb). As a matter of fact, Horace, North Dakota, had a population of only four hundred people and is approximately fifteen miles from the city of Fargo, North Dakota. The post office address of Rainbow Sales was listed as a post office box number at the Horace, North Dakota, post office.

The testimony of Cecelia Grunewalt, Director of the Division of Securities in the State of South Dakota, revealed that on October 4, 1977, a certificate of authority to do business in South Dakota was issued to Rainbow Sales, with Lawrence Bihlmeyer, an attorney officing in Rapid City, South Dakota, named as registered agent. Further, the records of the Division of Securities revealed that Rainbow Sales was not licensed to sell securities in South Dakota; that no license had ever been issued to appellant as a security agent; and that Donald Samuelson, employer of appellant, also was not licensed as a security agent in South Dakota.

Initially, it ought to be here observed that the dates of the various happenings that led to the arrest and conviction of appellant are of vital importance in the understanding of the claimed unlawful activity of appellant.

It appears that Donald Samuelson and appellant came to the Rapid City area in the early part of September, 1977. On September 16, 1977, Samuelson telephoned and asked Lyle Beaton, Agency Director for Dakota National Life Insurance Company (Dakota National), to meet him at the Imperial 400 Lounge in Rapid City. Mr. Beaton, accompanied by his wife, and Donald Swanson, a sales representative for Dakota National, and his wife, went to the Imperial 400 Lounge, where they met Donald Samuelson, his wife Val, and the appellant. Appellant was introduced by Samuelson as one of his salesmen. Appellant said very little at this meeting. Samuelson explained that he was working for Rainbow Sales, purchasing motels and other investment properties. Beaton and Samuelson had earlier worked together as insurance salesmen in North Dakota, and that was the basis for their acquaintance with each other. Beaton did not know appellant prior to the meeting. Beaton owned the Ranch House Motel in Rapid City, and it was agreed Samuelson would try to find a buyer for the motel. In

return, Beaton promised to assist Samuelson by providing him with the names of stockholders in Dakota National. Samuelson indicated that he was interested in purchasing stock in Dakota National in order to raise $50,000.00 to exercise an option to buy the Lake Bruin Motel in Louisiana. To pay for the stock Samuelson would give a promissory note for the value of the stock, plus a cash payment of $3.00 per share by the stockholder, which cash would be matched by Rainbow Sales. The note was to bear interest at twelve percent per year, and due in five years.

On September 19, 1977, Beaton accompanied Samuelson to Batesland, South Dakota, appellant not being present, where Samuelson showed one Max Deckert a pitch book containing a picture of the Lake Bruin Motel, as well as Beaton's motel. No stock was exchanged at this time. Samuelson indicated to Deckert that Beaton had money invested in Rainbow Sales, which was not true.

On September 22, 1977, Swanson and Samuelson went to Deckert's farm, appellant not being present, and at this time Deckert gave Samuelson 500 shares of Dakota National stock and a check for $100.00. Samuelson gave Deckert a receipt for $1,500.00.

On September 26, 1977, Walter Dale Miller, President of Dakota National, told Swanson and Beaton to immediately discontinue associating with Samuelson, or lose their jobs. Beaton thereupon went to Samuelson, told him to leave town, and also advised that they had discussed going to see the Attorney General. Beaton bought back Max Deckert's stock and also paid Samuelson's motel bill.

On October 3, 1977, appellant contacted Richard Olson, a salesman for Dakota National, and asked him to join him for lunch. At the luncheon meeting, appellant asked Olson for a list of stockholders in Dakota National. Appellant explained that he wished to call on the stockholders to advise that he had a good investment opportunity for them. Olson refused to furnish the list. Olson inquired of appellant if he was familiar with Rainbow Sales. Appellant denied any knowledge thereof. Appellant also denied knowing Samuelson or Beaton. This conversation was reported to the Attorney General.

On October 7, 1977, appellant and Samuelson went to the ranch owned by brothers Irwin and Hollis Young, near Philip, South Dakota. Samuelson talked with Hollis about his stock in Dakota National (Irwin had only an annuity with the company). Samuelson said he wanted to buy Hollis' stock in order to use it as security to purchase the Ranch House Motel in Rapid City and the Lake Bruin Motel in Louisiana. Samuelson said he was representing Rainbow Sales. Irwin gave Samuelson a check for $3,000.00 to invest for him. Irwin received a receipt from Samuelson, who promised to deliver a promissory note in that sum at twelve percent interest. Although Samuelson did most of the talking, appellant informed Irwin and Hollis that he had just returned from Louisiana, where he had stayed at the Lake Bruin Motel and that his purpose there was to look into the possibility of purchasing it. Appellant said it was a good piece of property for investment, since it was doing an excellent business. Appellant accompanied Hollis to Philip, South Dakota, where Hollis had his Dakota National stock in the safe deposit box at the bank. Appellant suggested he and Hollis wait for Samuelson at the hotel in Philip. Hollis gave Samuelson 216 shares of stock, plus $300.00 cash. Samuelson gave a receipt and promised a promissory note from Rainbow Sales.

On October 10, 1977, Swanson received a call from Samuelson and was asked to meet Samuelson at Roman's Ron Devu. Besides Swanson and Samuelson, Val Samuelson and appellant were also present. Samuelson told Swanson he wanted him to work for Rainbow Sales. Swanson questioned the legality of Samuelson's operations. Samuelson first advised Swanson that everything was legal but later admitted it was possible they might get arrested for a misdemeanor. Attempts were made by Val Samuelson to get attorney Lawrence Bihlmeyer to the meeting, but were not successful. Appellant insisted that Bihlmeyer had

advised that what they were doing was legal, but that even if it was illegal, "the most they could get busted for was a misdemeanor." Appellant further claimed Bihlmeyer was a good attorney and would take good care of them. Appellant and Samuelson showed several one hundred dollar bills to Swanson. Appellant told Swanson there was plenty of money to be made. Swanson told Val that Beaton had given Samuelson's pitch book to the Attorney General.

On October 12, 1977, Beaton and Swanson met with the Attorney General's office and it was decided that an investigation of Rainbow Sales should be commenced. George O'Clock, a retired F.B.I. agent, was contacted, as well as Thomas Timmons, to assist by listening to sales presentations. Walter Dale Miller, President of Dakota National, was asked to issue stock certificates of Dakota National to these individuals. Swanson was to advise Samuelson that he would go to work for him in order to assist in the investigation. O'Clock assumed the identity of Kenneth Forney, who with his wife owned stock in Dakota National.

On October 14, 1977, Swanson met Samuelson at Roman's Ron Devu. Val Samuelson and attorney Lawrence Bihlmeyer were present also. Appellant was not present at this meeting. Bihlmeyer advised Swanson he was attorney for Rainbow Sales, and that in his opinion Samuelson's operation was legal, but that if it was not, the most they could be held for was a misdemeanor.

On October 15, 1977, Samuelson having directed Swanson to set up meetings with Dakota National stockholders, and Swanson having been directed by the Attorney General's office to comply with the request, a meeting with Thomas Timmons and George O'Clock (posing as Kenneth Forney) was arranged. Samuelson (without appellant) met Timmons as prearranged and offered Timmons $3.00 per share for his stock, if Timmons placed matching cash in that amount, and in return Rainbow Sales would match the cash and issue its promissory note to Timmons for the total amount of the stock, plus cash payment, bearing interest at twelve percent. Timmons stated he did not have that much cash immediately

available, so a later meeting was set up to exchange the stock and cash for the note. After this Swanson and Samuelson went to meet George O'Clock (Kenneth Forney). Samuelson told O'Clock that Rainbow Sales owned the Lake Bruin Motel, which was untrue. O'Clock delivered his stock to Samuelson and received a receipt for it. O'Clock was to deliver matching cash at a later meeting and then would get the promissory note in the full amount.

On October 18, 1977, Swanson contacted Samuelson for their meeting with Timmons. At this time Samuelson told appellant to go with Swanson to meet Timmons. They met Timmons at the Crystal Lounge. Appellant went over the pitch book and talked about the purchase of the Lake Bruin Motel. During the sales presentation Timmons asked appellant if he was a registered agent authorized to sell securities in South Dakota. Appellant replied that he was. Appellant told Timmons that Samuelson was out of town that day (which was untrue, since Samuelson was in the Avanti Motel in Rapid City), and if he wanted to wait to see Samuelson, that was fine. Timmons advised appellant that he would transfer his stock now, whereupon the 1,080 shares of stock was delivered over to appellant, who in turn executed a receipt for the stock. Timmons was to meet Samuelson later to exchange the matching cash and delivery of the promissory note. Then Swanson and appellant proceeded to the Kenneth Forney residence, where they met George O'Clock posing as Kenneth Forney. Appellant told O'Clock that Samuelson was in Salt Lake City, which was untrue. O'Clock advised appellant that he wanted to give his check to Samuelson, so appellant left and shortly returned with Samuelson. At that time, Mrs. Forney gave Samuelson a check for $2,080.00. Samuelson again stated that Rainbow Sales owned the Lake Bruin Motel when, in fact, only an option to purchase was owned by Rainbow Sales. Samuelson said a promissory note would be mailed to the Forneys from their Fargo office. Appellant said nothing at this time.

■ Appellant first urges that the trial court erred in instructing the jury that no criminal intent need be shown to find appellant guilty of acting as a securities agent without registration and selling an unregistered security.

This contention is made despite the fact that this court had occasion to rule on this very same point in the case of *State v. Martin*, 85 S.D. 587, 187 N.W.2d 576 (1971), wherein it was stated:

> If any individual is engaged in the sale of securities, it is incumbent upon him if he does not understand the law to first ascertain both its content and its meaning. There is no reason to believe that the defendant did not know and fully understand what he was doing. The purpose of the Blue Sky laws is for the protection of the public. It is a public welfare statute.
>
> "The statute is remedial in its nature, and was passed to protect the inexperienced, confiding, and credulous investor, and save him from his own foolish cupidity. It should therefore be liberally and sympathetically construed in order that its beneficent purpose may, so far as possible, be attained."

85 S.D. at 594, 187 N.W.2d at 580 (citation omitted).

■ This court further recognized at that time that it is widely understood that the legislature may forbid the doing of an act and make its commission a crime without regard to the intent or knowledge of the doer. Whether criminal intent or guilty knowledge is an essential element of a statutory offense is to be determined by the language of the act in connection with its manifest purpose and design. That the *Martin* decision is in full accord with the prevailing law is abundantly clear. See 21 Am.Jur.2d Criminal Law §§ 89–91 (1965), and 22 C.J.S. Criminal Law § 30, p. 101 (1961), wherein in each of these treatises we are told that it is generally within the power of the legislature to declare an act criminal irrespective of criminal intent, and that due process is not violated by excluding criminal intent as an element of the crime.

This is especially true as to public welfare offenses, and food and drug offenses.

Appellant now urges that our decision in the *Martin* case ought to be set aside in favor of the more enlightened reasoning found especially in *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), and also to some extent in the case of *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). We decline this invitation and reaffirm all that was said in the *Martin* case.

The *Gypsum* case involved a prosecution under the Sherman Act (15 U.S.C. § 1). The *Gypsum* Court determined that the Sherman Act, unlike most criminal statutes, does not, in clear and categorical terms, precisely identify the conduct which it seeks to proscribe. Gypsum was charged with fixing prices, and because of the vagueness of the Sherman Act, the Court there felt it was patently unjust to designate a violation thereof as mala prohibita when there is such a thin line between what may be price fixing and what is not. Accordingly, the *Gypsum* Court held that in such cases where the Act is silent as to the requirement of criminal intent, such intent will be implied and is an essential element to be proved by the prosecution.

The *Morissette* case involved a defendant convicted of converting government bomb casings. The Court there essentially held that such an offense was taken over from the common law, which therefore required proof of criminal intent. The *Morissette* case is distinguished from the instant case since this case is based upon a public welfare offense, and it has no basis in the common law, therefore the legislature was within its power to exclude intent as an element of the offense.

The *Gypsum* case is distinguished from the present case, not only in that in *Gypsum* there is a vast range of business conduct that is sought to be proscribed, as compared to the offer and sale of securities, but also by the fact that there is nothing vague or elusive about the statutes that prohibit the offer and sale of unregistered security, and

the acting as a securities agent without having previously registered as such agent. What was said in *United States v. Flum,* 518 F.2d 39 (8th Cir. 1975), is pertinent here:

> "The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities."

518 F.2d at 42 (quoting from *Morissette v. United States,* supra).

"[T]he recent trend in the interpretation of federal criminal statutes has been to discover by implication a requirement of scienter, where there is no reason to suppose that the Congress *by deliberate choice,* omitted such a requirement." *Delaney v. United States,* 199 F.2d 107, 117 (1st Cir. 1952) (emphasis supplied).

It is interesting to note that SDCL 47–31–139 (Misrepresentations respecting exempt securities), which is part of the same securities chapter that makes the violation of SDCL 47–31–9 and SDCL 47–31–124 a crime without the requirement of criminal intent, requires an "intent to deceive." It is thus apparent that criminal intent was excluded by choice by the legislature in the enactment of said aforementioned statutes.

What was said as far back as 1943 in the case of *United States v. Greenbaum,* 138 F.2d 437 (3rd Cir. 1943), is true of our securities law even today:

> While the absence of any requirement of mens rea is usually met with in statutes punishing minor or police offenses (for which fines, at least in the first instance, are ordinarily the penalties), we think that interpretation of legislative intent as dispensing with the knowledge and wilfulness as elements of specified crimes is not to be restricted to offenses differentiable upon their relative lack of turpitude. Where the offenses prohibited and made punishable are capable of inflicting widespread injury, and where the requirement of proof of the offender's guilty knowledge and wrongful intent would render enforcement of the prohibi-

tion difficult if not impossible (i. e., in effect tend to nullify the statute), the legislative intent to dispense with mens rea as an element of the offense has justifiable basis.

138 F.2d at 438.

Appellant further urges that the trial court erred in refusing to instruct the jury on entrapment.

The law on entrapment is well-settled in South Dakota. In *State v. Williams,* 84 S.D. 547, 173 N.W.2d 889 (1970); and in *State v. Nelsen,* 89 S.D. 1, 228 N.W.2d 143 (1975), this court defined entrapment as "the inducement of one to commit a crime not contemplated by him for the mere purpose of instituting criminal proceedings against him."

■ *Williams* and *Nelsen* hold that where there is a conflict in the origin of intent, the question of entrapment is one for the jury, and conversely, that if there is no conflict in the evidence as to where criminal intent originated, then it is a question of law to be decided by the trial court.

■ There are two components required to successfully establish entrapment as a defense:

(1) The defendant must show police inducement to commit the crime; and

(2) That prior to this inducement he was not predisposed to commit the criminal act.

■ It is said that there are four principal inducements which may locate the intent in the government rather than the accused, and they are:

(1) Appeals to friendship;

(2) Sympathy;

(3) Offers of excessive amounts of money; and

(4) Appeal to a narcotic's need (not applicable here).

*State v. Nelsen,* supra, 228 N.W.2d at 148.

In addition to showing such inducement, the court in *Nelsen,* supra, stated that the defendant must also show that " 'undue, prolonged or persistent pressures were exerted against him, . . . that this inducement was dangled in front of him' . .

or that he was 'played upon.' . . ." 89 S.D. at 11, 228 N.W.2d at 148 (citation omitted).

■■ The *Nelsen* court further declared that several criteria ought to be considered, among others, that should help determine the origin of intent. Among those suggestions made and which are deemed pertinent here are: (1) Did the defendant first suggest the crime? (2) How ready was the defendant to commit the crime? Ready response to police inducement is certainly indicative of a predisposition to commit the criminal act. (3) How familiar was the defendant with the criminal activity? (4) Defendant's in-court testimony, if any, and out-of-court statements should also be examined where relevant to origin of intent. The *Nelsen* court also made it clear that there can be no entrapment where agents simply offer the defendant an opportunity to commit the offense.

Applying the law as we are obliged to do as set down in the *Williams* and *Nelsen* cases, it is now apparent that the people working with the Attorney General's office, namely, Beaton, Swanson, Timmons and O'Clock, "did nothing more than present an opportunity for defendant to carry his intent through to fruition." *State v. Nelsen,* 89 S.D. at 13, 228 N.W.2d at 150.

Without recounting once again the facts supporting this conclusion, reference is simply made to the statement of facts initially set out herein. From this, it will appear to the careful reader that the appellant had long prior to October 12, 1977, when the Attorney General's office first asked the named persons to cooperate in an investigation of Rainbow Sales, determined the course of action that he would follow. He was the declared agent of Samuelson; he made the presentation to Timmons and O'Clock on October 18, 1977; and he was familiar with all phases of the activity being promoted by Samuelson. None of the people assisting the Attorney General made any appeals to appellant based on friendship—indeed, none of them knew of appellant prior to this time; there was no sympathy, nor were there great amounts of money offered to appellant to induce him into selling an unregistered security, or to act as an agent, though not registered pursuant to law. The intent to commit an unlawful act originated with appellant; there was no police inducement. Appellant was clearly in the business of selling securities for Rainbow Sales, all he needed was the opportunity to make his "pitch." That opportunity was eventually afforded to appellant and led to his present predicament. The uncontradicted evidence establishes that appellant was ready and willing without persuasion and awaiting any propitious opportunity to commit the offense.

■ The trial court was correct in refusing appellant's requested entrapment instruction. There was insufficient evidence to put that issue to the jury.

The two remaining errors urged by appellant deal with the propriety of the trial court's instructions. We have carefully reviewed the court's instructions and find they properly state the law under the facts presented, and therefore no useful purpose would be served in further extending this opinion.

Accordingly, the conviction of appellant on each count is affirmed.

All the Justices concur.

HERTZ, Circuit Judge, sitting for HENDERSON, J., disqualified.