#30010-a-PJD
**2023 S.D. 25**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

CASEY W. FIDELER,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HUTCHINSON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE PATRICK T. SMITH
Judge

\* \* \* \*

CASEY W. FIDELER
Sioux Falls, South Dakota                    Pro Se appellant.


MARTY J. JACKLEY
Attorney General

JENNIFER M. JORGENSON
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
FEBRUARY 15, 2023
OPINION FILED **05/31/23**

DEVANEY, Justice

[¶1.] The defendant was charged with hunting on private land without permission from the owner in violation of SDCL 41-9-1. He pled not guilty, and a one-day bench trial was held. After the circuit court issued an oral ruling finding the defendant guilty beyond a reasonable doubt, the defendant filed a motion to reconsider. The court denied the motion and issued written findings of fact, conclusions of law, and a judgment of conviction. The defendant appeals, asserting multiple issues, including that his conviction should be reversed because SDCL 41-9-1 is not a strict liability offense. We affirm.

**Factual and Procedural Background**

[¶2.] On January 11, 2022, South Dakota Game, Fish, & Parks (SDGF&P) Conservation Officer Taylor Geerdes issued Casey Fideler (Fideler) a citation charging him with violating SDCL 41-9-1 for hunting on private land without permission from the owner. The citation described the offense as "resident unknowingly trespass" occurring "on or about 12/10/21," but the "10" was crossed out and a "09" was written above it. On January 18, 2022, Fideler, an attorney representing himself in this matter, entered a not guilty plea with the clerk of courts. He thereafter sent an email to the State's Attorney requesting discovery related to the charge.

[¶3.] On March 4, 2022, Fideler filed a motion to dismiss the complaint with an accompanying brief alleging various constitutional and other violations for which he believed dismissal was warranted. In particular, he alleged that there was no probable cause to support that the offense had been committed on the December 9

date alleged in the citation. However, he noted that the State had advised him during communication exchanges related to his discovery requests that he was being prosecuted for acts committed on December 10. In his brief, he also asserted that the charge of "unknowingly" trespassing fails as a matter of law because "intent is a required element in all crimes." In regard to his constitutional rights, he expressed multiple concerns related to the manner in which the investigation was conducted. He claimed that the State failed to provide him requested discovery, and he took issue with the State's decision not to interview certain witnesses that he believed were "vitally important" to refute the claims against him. Fideler filed a separate motion on March 4, 2022, requesting a continuance and alleging *Brady* violations based on the allegations raised in his motion to dismiss.

[¶4.] The circuit court held a hearing on Fideler's motions on April 4, 2022. The court noted that based on the information Fideler had provided to the court, the relevant date of the offense had been confirmed as December 10. The court also noted that time is not ordinarily a material element of the offense with which he was charged, unless the date concerned whether the act occurred in or out of hunting season. The court determined that the question whether Fideler was where he was alleged to be on or about December 9 or 10 was a matter for trial, not for a motion to dismiss. However, because of Fideler's concerns regarding the modification of the date in the citation, the court directed the State to file a formal complaint charging Fideler "with exactly the offense [the State] believes [he] has committed on exactly the date that it was alleged to have been committed on."

[¶5.]     Fideler's claim that the complaint should be dismissed because the State failed to provide requested discovery related to an incident that occurred on December 27, 2021, with Tripp Chief of Police Darren Donnelson. On that date, Chief Donnelson was advised that Fideler and his brother were looking for Drake Johnston because Fideler believed Johnston had turned him in for trespassing on property owned by John Koons. Chief Donnelson was at the Johnston residence when Fideler and his brother arrived, but the two eventually left after the chief told them to do so. Chief Donnelson provided this information to Officer Geerdes. According to Fideler, he had not been provided all the evidence related to this incident which he believed was relevant to determining the motivation for Officer Geerdes's decision to charge him on January 11, 2022. He also claimed that the withheld evidence could be exculpatory. In response, the State asserted that it provided Fideler with all the information it had and that there were no other reports. The circuit court directed the State to determine whether there was in fact an additional report from the December 27 incident and, if so, to provide that to Fideler. The circuit court denied Fideler's motion to dismiss, and with the parties' agreement, the matter was set for a court trial on May 10, 2022.

[¶6.]     On April 12, 2022, the State filed a formal complaint alleging Fideler violated SDCL 41-9-1 "on or about" December 10, 2021 by hunting "upon private land without permission from the owner of the land[.]" The following evidence was presented at the court trial. On December 10, 2021, Fideler and his father, Steve Fideler, Sr., were driving in Hutchinson County, South Dakota. Fideler was driving his own pickup, and Steve was in the passenger seat navigating. Steve told Fideler

that he had permission to hunt on property in the area and directed Fideler where to enter the specific property.

[¶7.] At some point while Fideler was driving, he noticed some deer stands and mentioned to Steve that he did not think the owner of the property hunted. After Steve agreed that the owner did not hunt, Fideler realized that he and his father were on someone else's property without the owner's permission. Fideler then attempted to drive off the property, but snowy weather conditions impaired his visibility, and while he was trying to find the area where he had entered, his pickup became stuck in an iced-over stock dam.

[¶8.] Fideler called Brian Sandau for help. Sandau testified that Fideler told him he "was out there hunting" and that he had gotten stuck in a stock dam. Fideler told Sandau that he did not know whose property they were on. Sandau testified that he located Fideler after Fideler sent him a pin location from his phone. Sandau entered the property by opening a closed wire gate near an adjacent road. He tried to pull Fideler's pickup out of the stock dam, but his efforts were not successful, and he ended up getting his own pickup stuck.

[¶9.] Sandau then called his wife, and she called others to assist, including Monte Brosz. Brosz testified that the pin location showed that Fideler and Sandau were stuck on John Koons's property. They entered the property through the same gated area Sandau had used and were able to pull Sandau's pickup out. However, the group decided to leave Fideler's pickup in the stock dam until it could be retrieved the next day. Fideler and his father returned to the property the next day with a tractor and after driving around the property for a while to find the stock

dam, they located it and pulled out Fideler's pickup. By this time, Fideler had learned that Koons owned the property.

[¶10.]    Koons, who did not live in the area, testified that on December 11, he learned from his sister-in-law that some people had been on his property. He reviewed his game camera footage and had pictures from the camera sent to his phone. These pictures were entered into evidence at trial and showed a pickup without a front license plate on his property on December 9; a different pickup on his property on December 11; and a tractor on his property on December 11.

[¶11.]    Koons testified that on December 12, he personally photographed the visible tracks throughout his property, the stock dam, and the wire gate that had been opened. He also testified that after the snow melted, he located various items in the area where the pickup had gotten stuck, including a wrench, a pry bar, and a magazine for a rifle containing .243 caliber bullets. Koons explained that based on the location where he observed tracks throughout the property, including tracks by "every shelterbelt and every creek," he believed someone was driving around trying to "spook game[.]" He also testified that at some point, he learned that Casey and Steve Fideler were the persons on his property. When asked whether he had given either of them permission to hunt on his property, Koons replied, "No."

[¶12.]    On December 13, Koons contacted Officer Geerdes to report that Fideler had been on his property without his permission and that he believed Fideler was on the property for purposes of hunting. Officer Geerdes met with Koons at his property, took photographs, and watched the game camera footage.

Koons gave her the photographs he had taken, the game camera photographs, and the items he had located in the stock dam.

[¶13.]     As part of her investigation, Officer Geerdes requested that SDGF&P District Conservation Officer Supervisor Dan Altman interview Steve Fideler. On December 19, 2022, Officer Altman conducted the interview at Steve's home in Tripp. The interview was recorded, and the video was played during Fideler's trial. It depicts a conversational exchange in which Officer Altman explained the purpose of his visit and asked whether Steve and his son were hunting on Koons's property. Steve denied that the two were hunting and repeatedly said they never fired a shot on the property. However, Steve agreed that they were on Koons's property without permission. At one point during the exchange, Officer Altman asked whether Fideler had a gun in his pickup. Steve answered affirmatively, but he also said that they "never fired a gun." As Officer Altman began to speak again, Steve interrupted, saying, "Yea, we did. Over across the road there. Shot some coons in a tree on that land." He also told Officer Altman that there were does (female deer) on the property, but they did not shoot them.

[¶14.]     On December 22, 2021, Officer Geerdes interviewed Fideler outside his home in Sioux Falls. This interview was also recorded and played at trial. She testified that during the interview, Fideler stated that "he was hunting coyotes," although she did not get a confirmation from him that he was hunting on Koons's property. In response to a question posed by the State, she agreed that the reason Fideler was "out there in the first place was because he was hunting." She testified

that the vehicle depicted on Koons's game camera on December 9 was similar to the pickup she had observed in Fideler's driveway.

[¶15.] During the recorded interview, Fideler admitted that he was on Koons's property, that his pickup had gotten stuck in the stock dam, and that he was on the property the next day with a tractor to pull out his pickup. He explained that he originally entered the property because his father told him he had permission to do so. He stated that he had been hunting coyotes, but when Officer Geerdes asked whether he was hunting on Koons's property, Fideler did not give a clear answer one way or the other. However, later during the interview, Fideler indicated that "after the point of chasing coyotes, [he] was really trying to get out" and had gotten his pickup stuck. Fideler then explained the circumstances surrounding his pickup getting stuck in the stock dam and the efforts he and others made to get it off Koons's property. He apologized for the items from his truck that likely fell out and were still in the stock dam, including his front license plate.[1] He also showed the officer his pickup and the damage that occurred as a result of the incident.

[¶16.] During cross-examination, Fideler asked Officer Geerdes about the information she had included in her investigative report related to the call she received on December 27, 2021, from Chief Donnelson. Officer Geerdes agreed that at the time she received the call, Fideler had not yet been charged. However, she testified that her conversation with Chief Donnelson "did not change [her] mind on

---

1.  Koons's game camera photo from December 9 that was admitted as an exhibit at trial shows a pickup without a front license plate. Sandau testified that the pickup in the photo "looked like" Fideler's pickup.

the opinion of what [she] was going to do with this case." She explained that she put the information from Chief Donnelson in her report "to acknowledge it" and further testified that she charged Fideler because Koons wanted to "proceed with charges[.]"

[¶17.] The State rested, and Fideler called Chief Donnelson to testify about the December 27 encounter at Drake Johnston's residence and about why Chief Donnelson contacted Officer Geerdes. Chief Donnelson testified that he contacted Officer Geerdes because he wanted to get an idea of the type of situation he would be encountering with Fideler. He further testified that it was only after Fideler argued with him and started videotaping what was transpiring that he threatened to issue him a citation for disorderly conduct. He noted, however, that Fideler eventually left and was never charged with any crime relating to these December 27 events. Fideler also questioned Chief Donnelson about whether he had reasonable suspicion or probable cause to stop him at the Johnston residence, and while the circuit court gave Fideler considerable leeway in questioning Chief Donnelson in general, the court sustained the State's relevancy objection as to these questions, and Fideler concluded his examination. Fideler also called other witnesses involved in the December 27 encounter with Chief Donnelson, including Johnston and his wife. Fideler elected not to testify in his own defense.

[¶18.] After the State and Fideler gave closing arguments, the circuit court issued an oral ruling. The court noted that it appeared that Fideler's biggest concern "was the motivation and manner in which this matter was investigated as opposed to the facts of the evening of December 10th as they were presented to this

[c]ourt." The court stated that it did not "find from any evidence presented . . . that there was any constitutional or statutory deprivation of any rights because of the manner in which it was pursued." The court then found from all the evidence presented that there was sufficient evidence to support beyond a reasonable doubt that Fideler violated SDCL 41-9-1 by "hunting on private land without permission from the owner[.]"

[¶19.] On May 12, 2022, Fideler filed a motion for reconsideration. His brief in support advanced multiple arguments. Relevant here, Fideler claimed that Chief Donnelson's conduct toward him amounted to an unlawful seizure and warranted the court's reconsideration of its guilty finding. The State objected to Fideler's motion and filed a brief in response. After considering the parties' filings, the circuit court issued an order on May 18 denying Fideler's motion to reconsider and directing the parties to submit proposed findings of fact and conclusions of law.[2]

[¶20.] On May 31, 2022, the circuit court issued written findings of fact and conclusions of law. The court found that Koons did not give Fideler permission to be on his property on December 10, 2021. Based on Steve's statements to Officer Altman, the court found that Steve and Fideler were on Koons's property for the purpose of hunting. From Fideler's recorded interview, the court found that Fideler admitted to Officer Geerdes that he and his father hunted on Koons's property on December 10 by pursuing coyotes and that they ceased hunting activities upon seeing the deer stands. As further support of the fact that Fideler "was armed and

---

2. Fideler proposed voluminous findings and conclusions, many of which asserted facts not in evidence or legal questions not implicated in this case.

hunting" on Koons's property, the court relied on "the clip with .243 rounds located on scene where [Fideler's] truck was disabled." The court acknowledged that Fideler mistakenly believed he had permission to hunt on the property, but the court determined that this was not a defense to the charge at issue. Ultimately, the court concluded beyond a reasonable doubt that Fideler violated SDCL 41-9-1 because the evidence established he was on Koons's property for purposes of hunting and that he did not have permission to be on the property. As a sentence, the court imposed a $300 fine with $200 suspended if Fideler paid the fine plus $78.50 in court costs by June 9, 2022.

[¶21.] On June 1, 2022, Fideler filed his notice of appeal from the circuit court's order denying his motion to dismiss, as well as from the court's order denying his motion to reconsider and the judgment of conviction. Fideler asserts the following issues:

> 1. Whether the circuit court erred in denying Fideler's motion to dismiss and motion for reconsideration.
>
> 2. Whether SDCL 41-9-1 is a strict liability offense.
>
> 3. Whether the circuit court initiated an ex parte communication with the State.

## Analysis and Decision

### 1. Whether the circuit court erred in denying Fideler's motion to dismiss and motion for reconsideration.

[¶22.] Fideler asserts his constitutional rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, including his right to due process, were violated. With respect to this assertion, he makes several claims that are hard to decipher, were not raised below, or are not supported factually or

legally.[3] He first contends that the circuit court erred in concluding that the date is not a material element of the offense with which he was charged and that such error violated his right to defend against the charge.[4] Aside from the fact that Fideler has not offered any authority supporting that time is a material element of a charge under SDCL 41-9-1, we note that he focuses only on the December 9 date in Officer Geerdes's January 2022 citation and his claim that it was legally and factually impossible for him to have committed the offense on that date. But the controlling charging document in this case is not the January 2022 citation; it is the April 2022 complaint, which charged an offense occurring on or about December 10.[5]

---

3. The State asserts that Fideler waived for appellate review many of his arguments under issue one because he either did not assert the argument before the circuit court or failed to comply with the rules of appellate procedure in SDCL 15-26A-60(4) and (6). While the State is correct that Fideler did not advance certain arguments below and that he does not in all instances strictly comply with SDCL 15-26A-60, a review of the record reveals that many of his arguments were presented below in filings not referenced by the State, including Fideler's brief filed in support of his motion to dismiss and his proposed findings of fact and conclusions of law. Therefore, we address only the waiver arguments regarding issues that were not in fact raised.

4. While these are Fideler's primary or overarching arguments under this issue, he includes additional arguments that were not asserted below or are not applicable to the case at hand. For example, he refers to the sufficiency of an indictment, but he was not indicted, and he did not challenge the sufficiency of the April 2022 complaint. He also refers to the right to be free of double jeopardy and claims an inability to defend against a future prosecution for the same offense, but this argument was never raised below, and it is unclear on what basis Fideler believes he could be twice prosecuted for violating SDCL 41-9-1 based on the same alleged conduct.

5. Fideler further asserts that his right to defend against the charge was prejudiced by the use of "on or about" and directs this Court to the law on

(continued . . .)

[¶23.]     Fideler next asserts that the State changed the wording of the charged offense from "trespass (unknowing)-resident" to "hunting without landowner permission" to "failure to obtain landowner consent" so it could avoid the burden of proving he had criminal intent.  However, the State never in fact changed the underlying offense—both the January 2022 citation and April 2022 complaint identify the alleged offense as a violation of SDCL 41-9-1.  Because Fideler's alleged due process arguments with respect to this issue are based on an inaccurate premise, we need not address them.

[¶24.]     Fideler's third argument relates to the December 27, 2021 encounter involving Chief Donnelson.  He claims that he was subjected to an unlawful seizure by Chief Donnelson even though he "had done nothing wrong, [was] unarmed, nonviolent, and submitting to the requests of legal authority."  He also claims Chief Donnelson interfered with the underlying investigation by falsely reporting what had occurred on December 27 to Officer Geerdes to influence the State to charge him with a hunting violation and to prevent him from asserting his rights and contesting the underlying offense.[6]

---

(. . . continued)

alibi defenses, suggesting that a range of dates could not be used here to nullify an alibi defense.  However, Fideler did not advance to the circuit court the argument that an alibi defense rendered the date material.  *See State v. Podzimek*, 2019 S.D. 43, ¶ 27, 932 N.W.2d 141, 149 (providing that "[o]rdinarily an issue not raised before the [circuit] court will not be reviewed at the appellate level" (second alteration in original) (citation omitted)).  Instead, his arguments to the court related to his request for discovery as to the alleged date so that he could prepare for trial.

6.     Fideler characterizes Chief Donnelson's conduct as a "taint" that is a "structural defect . . . that cannot be purged."  But Fideler does not cite any

(continued . . .)

[¶25.] Fideler's assertions are based on the faulty notions that he was in fact detained or arrested on December 27 and that the December 27 incident is somehow relevant to whether he was properly charged and convicted of a hunting violation alleged to have been committed two weeks earlier. There is nothing in the record to support either notion. Although Fideler describes the December 27 incident in detail in his brief, he did not testify at trial, none of the witnesses provided the detail he has included in his appellate brief, and the law enforcement reports that Fideler did offer at trial are contrary to his characterization of the events on appeal. We further note that he has provided no support, legal or factual, for his implied argument that Chief Donnelson's conduct and call to Officer Geerdes resulted in an improperly motivated prosecution that would warrant reversal of his conviction.

[¶26.] Fideler's final claims under this issue are confounding. He refers to the State's failure to call as witnesses the people named in Chief Donnelson's report who had made accusatory statements against him, but then he also asserts that the admission of his "subsequent bad acts" violated SDCL 19-19-404(b). Neither argument was made below, and it was Fideler, not the State, who deemed the evidence of what transpired on December 27 relevant and offered it at trial.

[¶27.] Because a review of Fideler's arguments does not support that he was deprived of due process or the right to defend himself, the circuit court did not err in denying his motion to dismiss and motion for reconsideration.

---

(. . . continued)

law to support the notion that Chief Donnelson's conduct, which he alleges to be improper, would constitute a "structural error" as defined by this Court. *See State v. Evans*, 2021 S.D. 12, ¶ 42 n.13, 956 N.W.2d 68, 85 n.13 (noting the limited categories of errors found to be structural).

## 2.      *Whether SDCL 41-9-1 is a strict liability offense.*

[¶28.]      Fideler acknowledges that the Legislature did not include a mens rea in the plain language of SDCL 41-9-1, but he directs this Court to case law in which we have stated that we avoid construing criminal statutes to create strict liability. *See, e.g., State v. Jones*, 2011 S.D. 60, ¶ 10, 804 N.W.2d 409, 413; *State v. Armstrong*, 2020 S.D. 6, ¶ 33, 939 N.W.2d 9, 17; *State v. Stone*, 467 N.W.2d 905, 906 (S.D. 1991).  He argues that a mens rea should therefore be read into SDCL 41-9-1.

[¶29.]      In support of his claim that SDCL 41-9-1 is not a strict liability offense, he first notes that the Legislature imposed different punishments for violating the statute depending on the violator's mental state, which he characterizes as "knowing" and "unknowing" mental states.  He suggests that the imposition of different punishments indicates "the legislature did not intend to punish innocent conduct."  Fideler then asserts that the circuit court erred in determining that the charge of hunting without permission contains no mens rea, arguing more broadly that the State was required to prove his "mental state: his awareness of the character and nature of his acts."  And because, in his view, the State was required to prove his mental state, he argues that the court should have considered his mistake of fact defense, i.e., that he "reasonably, although mistakenly, believed he had permission to act," citing *State v. Toben*, 2014 S.D. 3, 842 N.W.2d 647, as support.[7]

---

7.      In response, the State's brief on appeal offers a perfunctory argument that the plain language of SDCL 41-9-1 evinces the Legislature's intent to create a strict liability crime.  The State does not provide an analysis of the pertinent case law on the circumstances under which a statute that is silent as to mens

(continued . . .)

[¶30.]	SDCL 41-9-1 provides that "no person may fish, hunt, or trap upon any private land without permission from the owner or lessee of the land." It further provides that "[a] violation of this section is a Class 2 misdemeanor and is subject to § 41-9-8."[8] Under SDCL 41-9-8, if a person is found guilty of SDCL 41-9-1, the court *may* revoke the person's hunting privileges for one year. However, SDCL 41-9-8 further provides that a person who "*knowingly* enters or remains on private property for the purpose of hunting, . . . in violation of § 41-9-1[,] . . . *shall* be fined five hundred dollars, and *shall* lose hunting . . . privileges for one year following a finding of guilt or a conviction." (Emphasis added.)

[¶31.]	In its findings and conclusions, the circuit court did not specifically declare that SDCL 41-9-1 is a strict liability offense. However, it noted that while SDCL 41-9-1 "makes no distinction between 'knowingly' or 'unknowingly'," SDCL 41-9-8 provides for enhanced penalties for violations of SDCL 41-9-1 committed "knowingly." The court identified Fideler's charge as an unknowing trespass and therefore did not allow a mistake of fact defense. The court ultimately found Fideler guilty based on the evidence that he was hunting on Koons's property without permission. Whether SDCL 41-9-1 is a strict liability offense requires this Court to interpret the statute and determine the Legislature's intent. As is well

_____

(. . . continued)

rea should be construed as a strict liability crime. *See, e.g.*, *Jones*, 2011 S.D. 60, ¶ 10, 804 N.W.2d at 413; *Staples v. United States*, 511 U.S. 600, 605, 114 S. Ct. 1793, 1797, 128 L. Ed. 2d 608 (1994).

8.	A Class 2 misdemeanor subjects a violator to a punishment of up to 30 days in jail or a $500 fine or both. SDCL 22-6-2.

established, questions of statutory interpretation are reviewed de novo. *Farmer v. Farmer*, 2022 S.D. 47, ¶ 34, 979 N.W.2d 173, 183.

[¶32.] We begin with the plain language of the SDCL 41-9-1, which is silent concerning the mens rea required for a violation. However, "silence on this point by itself does not necessarily suggest that [the Legislature] intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal." *Jones*, 2011 S.D. 60, ¶ 10, 804 N.W.2d at 412 (quoting *Staples v. United States*, 511 U.S. 600, 605, 114 S. Ct. 1793, 1797, 128 L. Ed. 2d 608 (1994)); *State v. Vandyke*, 2023 S.D. 9, ¶ 13, 986 N.W.2d 772, 775. In fact, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence" and "offenses that require no *mens rea* generally are disfavored[.]" *Jones*, 2011 S.D. 60, ¶ 10, 804 N.W.2d at 412 (alterations in original) (citation omitted). Therefore, there must be "some indication of [legislative] intent, express or implied[,]" "to dispense with *mens rea* as an element of a crime." *Id.* ¶ 10, 804 N.W.2d at 412–13 (quoting *Staples*, 511 U.S. at 606, 114 S. Ct. at 1797).

[¶33.] To determine "[w]hether criminal intent or guilty knowledge is an essential element of a statutory offense," this Court looks to "the language of the act in connection with its manifest purpose and design." *Id.* ¶ 11, 804 N.W.2d at 413 (quoting *State v. Nagel*, 279 N.W.2d 911, 915 (S.D. 1979)). Here, the language of SDCL 41-9-1 reveals that its manifest purpose and design is to punish, as a Class 2 misdemeanor, *both* knowing violations of the statute and violations that occur without criminal intent or guilty knowledge. Such intent is reflected by the

Legislature's reference in SDCL 41-9-1 to the applicability of SDCL 41-9-8, which sets forth enhanced penalties depending on the nature of the violation of the statute. In particular, while all violations of SDCL 41-9-1 subject an offender to the potential penalties associated with a Class 2 misdemeanor and the potential loss of hunting, trapping, or fishing privileges, SDCL 41-9-8 *mandates* a maximum fine of $500 and the loss of such privileges for one year when one "*knowingly* enters or remains on private property for the purpose of hunting." (Emphasis added.) Thus, by differentiating the penalties for knowing violations from those occurring without criminal intent, it is apparent the Legislature intended to punish all violations of SDCL 41-9-1 regardless of an offender's mental culpability.

[¶34.]      Further, a review of SDCL chapter 41-9 as a whole reveals that the Legislature was selective as to which violations require a mens rea. For example, SDCL 41-9-1.1 (hunting from highways and public rights-of-way within certain distances from livestock and dwellings), like SDCL 41-9-8, differentiates between a violation that is knowing and one that is not by providing an enhanced penalty for a knowing violation. As another example, the Legislature prescribed a mens rea, although a different one, under SDCL 41-9-1.6, which states that "[a]ny person who, while hunting a road right-of-way, *negligently* endangers another person, or puts that person in fear of imminent serious bodily harm, is guilty of a Class 1 misdemeanor." (Emphasis added.) Yet other provisions in this chapter do not contain any mens rea element. *See* SDCL 41-9-4, -5 (pertaining to posting land of another without permission or removing or damaging legally posted notices).

-17-

[¶35.] As the Court in *Nagel* stated, because provisions within the same chapter differ in the sense that one includes criminal intent and the other does not, "[i]t is thus apparent that criminal intent was excluded by choice by the [L]egislature[.]" 279 N.W.2d at 916. An Arizona court reached the same conclusion that a law requiring that an individual "use a tag [permit] only in the season and hunt area for which the tag [permit] is valid" is a strict liability offense. *State v. Slayton*, 154 P.3d 1057, 1061–62 (Ariz. Ct. App. 2007) (alterations in original). The court noted that the law contained no culpable mental state. However, similar to South Dakota's legislative scheme, Arizona's "provided lesser penalties for those who commit an offense that requires no particular mental state but more severe penalties if the perpetrator engages in similar conduct with knowledge." *Id.* at 1061. Therefore, the Arizona court concluded that "it is clear the legislature intentionally added a required mental state for certain offenses, while specifically omitting any such requirement for others." *Id.*

[¶36.] Further supporting that the Legislature intended to dispense of a mens rea element in SDCL 41-9-1 is the United States Supreme Court's differentiation between offenses that depend on a mental state and offenses that are in essence public welfare measures. In *Morrissette v. United States*, the Court explained that public welfare "offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty." 342 U.S. 246, 255, 72 S. Ct. 240, 246, 96 L. Ed. 288 (1952). Also, "[m]any violations of such regulations result in no direct or immediate injury to person or property but merely

create the danger or probability of it which the law seeks to minimize." *Id.* at 255–256, 72 S. Ct. at 246. Therefore, "legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element." *Id.* at 256, 72 S. Ct. at 246. This is because "whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity." *Id.* Importantly, "[t]he accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Id.*

[¶37.]        This Court has also acknowledged that "[l]egislative acts which are essentially public welfare regulatory measures may omit the knowledge element without violating substantive due process guarantees." *Stone*, 467 N.W.2d at 906; *see also Nagel*, 279 N.W.2d at 915 (providing that an "absence of any requirement of mens rea is usually met with in statutes punishing minor or police offenses (for which fines, at least in the first instance, are ordinarily the penalties)" (quoting *United States v. Greenbaum*, 138 F.2d 437, 438 (3d Cir. 1943))). Notably, SDCL 41-9-1 is a regulatory measure in nature with a minimal penalty, and the plain language of SDCL 41-9-1 does not contain a mens rea element for the less punitive violation, but SDCL 41-9-8 does require a violation to be knowing for the harsher penalty. Therefore, it is apparent that the Legislature intended SDCL 41-9-1 to be a strict liability offense.

### 3.    *Whether the circuit court initiated an ex parte communication with the State.*

[¶38.]        In support of his contention that the circuit court initiated an ex parte communication, Fideler quotes an exchange that occurred at trial between him, the

court, and the State during his cross-examination of Chief Donnelson related to whether the chief intended to arrest him for disorderly conduct during the December 27 encounter. At trial, the State objected, asserting such testimony would not be relevant. The court sustained the objection. Thereafter, the following colloquy occurred:

> **The court**: As I understand it, the question is: why weren't there charges when there was backup called and a report written? I will state that there was a report written because, during the discovery process, I indicated to Mr. Roth, upon your request, Mr. Fideler, that if any officers had any involvement, they should have a report. One was written. Not – a report does not – simply because a report is written does not mean a charge is filed or pursued.
>
> This witness testified that, *while he had the ability to write a report and did, in fact, upon request of the State which came from the Judge which came from you, Mr. Fideler - - . . . a report was written*, that that doesn't mean he was planning on arresting anyone. And after he had done his investigation, he was satisfied, from what I understand from his testimony, that the matter was addressed without there being a need for or justification for any charges.
> . . .
> Do you agree that the report came about because you asked Mr. Roth - -
>
> **Fideler:** Yes, sir.
>
> **The court:** - - and asked me - -
>
> **Fideler:** I'm fine with all that. *That's not – the report and where it came from – I'm not concerned with that at all.* It's the timing, the date, the information contained within in - - . . . not the actual report.

(Emphasis added.)

[¶39.]    Fideler suggests that the circuit court, by referring to a report resulting from a request "which came from the Judge which came from you[,]"

"admitted to initiating an ex parte communication with the State regarding the creation of an after-action report by officer Donnellson [sic], a witness in the current proceeding." But Fideler has not identified any ex parte communication. The court was referring to Fideler's own request that the State produce discovery he believed was being withheld and the court's order directing the State to produce reports, if such existed.[9] Notably, the court specifically gave Fideler the opportunity to correct or clarify what the court had stated, and Fideler stated that he had no concerns with "the report and where it came from." From our review of the record in its entirety, the circuit court did not engage in any ex parte communications. To the contrary, it is apparent the court extended much latitude to Fideler throughout the course of these proceedings to ensure he received a fair and impartial trial.

[¶40.]	Affirmed.

---

9.	Outside of this colloquy at trial, the record does not reveal that the circuit court ever ordered the State to direct Chief Donnelson or any other officers to write a report. It appears from the comments related during trial that the court may have been mistakenly referring to an email exchange initiated by Fideler that occurred on April 11 after the April 4, 2022 hearing on Fideler's motion to dismiss. In this email exchange with the court, Fideler claimed that the State had failed to produce all reports related to the December 27 incident. However, it is apparent that Fideler was not referring to Chief Donnelson's report because he had already received and appended that report to the brief he had filed on March 23, 2022 in support of his motion to dismiss. In his April 11 email, Fideler asked the court to direct the State to have reports written by *any of the other officers* responding to Chief Donnelson's call for assistance or at least give him the names of the officers. The court declined to order that reports be written and instead directed the State to produce the names of the officers. At trial, Fideler offered reports from two Hutchinson County officers who responded to the call for assistance. These reports were written two days after Fideler's email exchange with the court, and both officers state in the reports that they were asked by *the State* to write them.

[¶41.]        JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices,

concur.